FILED by fgs D.C.
JUL 30 2009
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.

**09-22260**

SILVIA BLANCO, an individual,

Plaintiff,

vs.

**CIV-KING**

MIAMI BEACHFRONT INVESTMENTS, LLC, a Florida limited liability company, FORTUNE INTERNATIONAL REALTY, INC., a Florida corporation, EDGARDO DE FORTUNA, an individual, HUGO BIANCHI, an individual,

**MAGISTRATE BANDSTRA**

Defendants.
_______________________________________/

# NOTICE OF REMOVAL

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA:

Defendants MIAMI BEACHFRONT INVESTMENTS, LLC, FORTUNE INTERNATIONAL REALTY, INC., and EDGARDO DE FORTUNA ("Defendants"), by and through undersigned counsel, hereby give notice of removal of this action from the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, where such action is pending as Case No. 09-49095 CA 25.

This Notice of Removal is filed pursuant to 28 U.S.C. §§ 1441 and 1446. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, specifically the Securities and Exchange

Act of 1934 (15 U.S.C. 78j(b)). (*See* Count II of the Complaint, attached hereto as Exhibit 1.)

Plaintiff SILVIA BLANCO, an investor of Miami Beachfront Investments, LLC, served Defendants with the Complaint on June 30, 2009. (*See* summonses attached as Exhibit 2.) Count II of the Complaint claims that Defendants violated Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), by making various alleged material misrepresentations to Plaintiff to induce her to purchase the membership interests. (*Id.* ¶¶ 30-33.) Therefore, this Court has exclusive and original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa ("The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.")

Defendants shall contemporaneously herewith provide a copy of this Notice of Removal to Plaintiff's counsel and promptly file a copy of this Notice with the Clerk of the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, pursuant to 28 U.S.C. § 1446(d).



COFFEY BURLINGTON
OFFICE IN THE GROVE, PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
Email: info@coffeyburlington.com www.coffeyburlington.com

WHEREFORE, Defendants respectfully requests that this Court accept jurisdiction over this case.

Respectfully submitted,

COFFEY BURLINGTON
*Counsel for Defendants MIAMI BEACHFRONT INVESTMENTS, LLC, FORTUNE INTERNATIONAL REALTY, INC., and EDGARDO DE FORTUNA*
Office in the Grove, Penthouse
2699 South Bayshore Drive
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261
E-mail: sraffanello@coffeyburlington.com

By: ______________________
Susan E. Raffanello
Florida Bar No. 676446

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. Mail on this 30th day of July, 2009, upon the following:

Gerardo A. Vazquez
Vazquez & Associates
Suite 500
1401 Brickell Avenue
Miami, FL 33131
Tel: 305-371-8064
Fax: 305-371-4967
*Counsel for Plaintiff*

Susan E. Raffanello



COFFEY BURLINGTON
OFFICE IN THE GROVE, PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
Email: info@coffeyburlington.com www.coffeyburlington.com

ATTACHMENT / EXHIBIT______

Beach Svc Copy

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI DADE COUNTY FLORIDA

SILVIA BLANCO, an individual
Plaintiff,

CASE: 09-49095 CA 25

vs.

MIAMI BEACHFRONT INVESTMENTS, LLC.
A Florida limited liability company,
FORTUNE INTERNATIONAL
REALTY, INC. A Florida Corporation,
EDGARDO DE FORTUNA, an individual,
HUGO BIANCHI, an individual.
Defendants.
_______________________________/

## COMPLAINT

Plaintiff, SILVIA BLANCO ("BLANCO") through her undersigned attorney, sues Defendant, MIAMI BEACHFRONT INVESTMENTS, LLC. ("Issuer or Company"), FORTUNE INTERNATIONAL REALTY, INC. A Florida Corporation ("Promoter" or "Fortune"), EDGARDO DE FORTUNA, an individual ("Promoter De Fortuna"), HUGO BIANCHI, an individual ("Promoter Bianchi").

## JURISDICTION

1. This is an action for violations of the registration and antifraud provisions of the federal securities laws, Securities and Exchange Act of 1933, Florida Securities

statutes, misrepresentation, fraud in the inducement and an accounting with damages in excess of $15,000 and which therefore comes within the jurisdiction of this Court.

2. Plaintiff, Blanco, is a resident of Cuidad Bolivar, Venezuela.

3. Defendant, Issuer is a Florida limited liability company whose principal place of business is in Miami-Dade County, Florida.

4. Defendant, Fortune is a Florida corporation whose principal place of business is in Miami-Dade County, Florida.

5. Defendant, Promoter De Fortuna is a resident of Miami-Dade County, Florida.

6. Defendant, Promoter Bianchi is a resident of Miami-Dade County, Florida.

7. The transaction, which is the subject matter of this complaint, occurred in Miami-Dade County, Florida.

8. Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and the mail in connection with the acts and practices complained herein.

## DEFENDANTS

9. Promoter De Fortuna is the President and CEO of Fortune, a real estate broker and development corporation. Promoter De Fortuna is well known as an experienced real estate developer in the South Florida area with over twenty years of experience in the development of real estate projects. Furthermore, it is well known in

the local south Florida community that De Fortuna real estate development projects have been and are financed in part through the acquisition of investors who participate in the development of the real estate projects for the sole purpose of generating a profit by the sole efforts of Fortune. Therefore falling under the definition of a security. It is also well known in the local south Florida community that Promoter De Fortuna utilizes the assistance of real estate brokers, accountants, bankers and investment participating in the development of the real estate projects. It is also well known in the community that such Investment Promoters are paid a commission for every investor who actually invests in the real estate projects with Promoter De Fortuna.

10. Promoter Bianchi is a Director of Fortune and acts a salesperson for the Issuer by meeting with potential investors, explaining the investment strategy, emphasizing the benefits of the investment in the Issuer and ultimately the investment strategy. In addition, Promoter Bianchi, follows up with investors to coordinate payment as agreed for the investment and gives information to the investors regarding the viability of the investment, status of sales of the real estate development project and their overall success.

11. Promoter De Fortuna fully controls and operates Fortune and the Issuer. In addition, Promoter Bianchi acts as and hold himself to the public as acting as an agent of Fortune and the Issuer under the control and direction of Promoter De Fortuna.

12. Blanco is a foreign national who went to Fortune looking to purchase real

estate and who was offered to invest in the Company as an alternative to and as a better option to the purchase of real estate. Furthermore, Blanco is not a sophisticated real estate investor, and does not speak English.

THE FRAUDULENT SCHEME

13. Since on or about 2003, Promoter De Fortuna has orchestrated a scheme in order to raise capital for the construction and marketing of his real estate developments. The scheme consists in soliciting investors inside and outside of Florida for the purpose of raising capital to be used for the construction and marketing of real estate developments primarily located in Florida. Once the pool of investors has been gathered and the capital has been raised, Promoter De Fortuna through Fortune, commences the process of obtaining financing for the construction of the project through the use of institutional lenders secured in part by the capital raised from the investors.

14. As a means of soliciting investors, Promoter De Fortuna, through Fortune, created a scheme where *sales people* would be recruited for the purpose of soliciting investors for Fortune. These *sales people* recruited consisted of real estate agents, attorneys, private bankers and accountants who have access to people with the means of investing large amounts of money.

15. On or about November 2004, at a meeting Blanco was solicited by one of

these *sales people,* Mr. Mauricio Armando ("Armando"), a private banker working for Banco Santander. Armando personally introduced and arranged for Blanco to meet with Promoter De Fortuna and Promoter Bianchi with the intent to have Blanco become one of Fortune's investors.

11. Blanco met with Armando and expressed an interest in purchasing real estate in Florida.

12. After the meeting with Armando, Blanco was introduced by Armando to Promoter De Fortuna and Promoter Bianchi, who were acting as representatives of both the Company and Promoter. The purpose of the meeting was for Blanco make a real estate investment with Fortune. Blanco met with Promoter De Fortuna and Promoter Bianchi at Fortune offices located in Brickell in Miami, Florida.

13. In the meeting with Seller De Fortune and Promoter Bianchi, Blanco was presented with the possibility of investing in the Company as an alternative to a real estate investment in Florida where she was promised a return on her investment and even the possibility of purchasing a unit in the condominium development that the Company would build at a special "investor's price".

14. Blanco was at no time represented by counsel during the meeting with Promoter De Fortuna and Promoter Bianchi and was not offered the opportunity to consult with counsel when presented with the investment documentation and agreements.

15. On or about November 2004, Promoter De Fortuna, Promoter Bianchi and Mauricio Armando persuaded Blanco to pursue the investment in the Company as alternative to investing in the purchase of real estate with Fortune. Blanco was clearly and unmistakably promised a return on her investment in the shares of the Company by Defendants solely through the Defendant's efforts. Relying on those promises of a return, Blanco made payment to Fortune in the amount of $362,500 ("Purchase Price") and received in return 50,000 shares in Navy Sky Group Investments Ltd., and 102 Units representing (1.2%) interest in the Company ("Shares") entitling Blanco to (0.01%) interest in the profits and losses of the Company per each unit of interest pursuant to the Company's Subscription Agreement.

16. Promoter De Fortuna and Promoter Bianchi gave Blanco tax advise and told her that the purchase of the Shares in the foreign corporation was done in order to mitigate the tax consequences of the profit that would be realized on the investment in the Company.

17. The purpose of the investment in the purchase of the Shares was to become a limited partner in a real estate development of a mixed-use condominium consisting of residential condominium units and fractional ownership units ("Project"). The Project was to be developed and sold by the Promoter.

18. Days after the meeting between Blanco Promoter De Fortuna and Promoter Bianchi, Blanco received the Company's Subscription Agreement together

with the Purchaser Questionnaire (Attached hereto as Exhibit 'A"). The Subscription Agreement was explained in Spanish to Blanco by Promoter Bianchi over the phone as Blanco does not have knowledge to read English. Therefore Blanco completely relied on the representations and explanations Promoter Bianchi and other Fortune representatives made regarding the Subscription Agreement at the time it was sent to her and at the initial meeting with Promoter De Fortuna.

19. Furthermore, the Company's Subscription Agreement provided a list and explanation of risks factors related to the investment including:

- Cyclical nature of real estate market and sensitivity of investment to economic conditions
- Risk of use of fractional ownership as a new real estate investment concept
- Risks of the partnership and joint venture decisions
- Non-availability of financing for the project
- Partnership with Ritz Carlton before 12/31/04 as a condition precedent for the project to commence
- Reliance on third parties for construction and development of project
- Delays in construction
- Increased interest rate risks that could affect sale of the units in the project
- Competition with other projects
- Possible non-profitability of the project – may not have member distributions
- No adequate insurance that can result in liability for non covered losses
- Terrorism
- Company is subjected to the risk of the decisions and control of the Manager (Fortune International)
- Success is subjected to key personnel of the Manager
- Manager's fees are not done at arm's length negotiations
- Allocation to Members may not be proportionate to

member's capital contributions
- Tax risks
- Loss of Company's partnership status for tax purposes
- Company's accounting method could be challenged
- Members and Company could be audited by IRS
- Investment is non transferable and illiquid
- Investors will incur immediate and substantial dilution
- Documents given to potential investors are not complete
- Members may be liable for improper distributions
- Company and the Manager have the same legal representation

Subscription Agreement Exhibit A, Risk Factors.

20. However, at the same meeting between Blanco and Promoter De Fortuna and Promoter Bianchi, Blanco was explicitly told several misleading and/or false statements intended to induce Blanco to purchase the Shares. These misleading and/or false statements even though not included in the Subscription Agreement, were explicitly relied on by Blanco in her decision to invest in the Company. These statements included representations such as:

- That the Project would be completed in no more than 34 months. This was disclosed verbally to Blanco in the initial meeting with Promoter De Fortuna and Promoter Bianchi.
- That the investment in the Shares and the Project was not a risky one, since the investment would be at all times backed by the value of the land owned by the Company, which was sufficient to cover Plaintiff's Purchase Price.
- That the investment in the Shares was better than purchasing real estate

because it would allow to Blanco to make at least 30% return and still acquire real estate in the Project at a preferred list pricing from Promoter.

21. In addition, Blanco was repeatedly assured by Bianchi that the Project was well under schedule in construction and in the percentage of units sold and that the Shares were worth more everyday.

22. Promoter provided only two updates on the status of the construction and sales of the Project to Blanco and other investors and at all times would only provide information on the Project to Blanco when Blanco would either call or visit Promoter's offices in Miami, Florida.

23. It was only on or about March 15th, 2009, that after Blanco requested a meeting with Promoter and Promoter Bianchi that a representative of Promoter and Promoter Bianchi admitted to Blanco that Blanco's investment had been losing value and potentially completely at risk of loss since 2005. This after Blanco had been assured of the opposite over the three subsequent years by Promoter Bianchi.

24. During such meeting between Blanco, Promoter's representative and Promoter Bianchi the following admissions were made by Promoter's representative and Promoter Bianchi:

- That the partnership with Ritz Carlton had been terminated.
- That the value of the land had been depreciated to the point that it no longer could cover the mortgage of the same.

- That the construction for which the investment was created had been discontinued because it was no longer profitable.
- That all deposits of sales of the condominium units and fractional units had been canceled and deposits returned to buyers.
- That the negative information about the project could not be given to investors because it would affect the value of the Project and therefore for that reason they had not told Blanco of the situation.

## COUNT I
## VIOLATION OF THE REGISTRATION PROVISIONS OF FEDERAL AND FLORIDA SECURITIES LAWS

25. The allegations of paragraphs 1 through 24 are repeated as if fully set forth herein.

26. Sections 5(a) and 5(c) of the Securities Act of 1933 prohibit the offer and sale to the public of any security unless a registration statement is in effect with regard to the security, absent an applicable exemption from registration 15 U.S.C. §77e (a) & (c).

27. Issuer and Promoter attempted to rely on one of these exceptions by selling to *accredited investors* as defined under Rule 504 of Regulation D of the securities Act of 1933. In order to do so, Issuer and Promoter provided Blanco with the Purchaser Questionnaire, Blanco certified that she qualified as an *accredited investor* by stating

that: as an individual whose net worth was over $1,000,000 and whose income was more than $200,000 for the last two years at the time of the investment and that she had an expectation to have the same or greater income in the year in which the investment was made. Additionally, Blanco certified that she possessed sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the investment. Clearly, Issuer had Blanco sign the Purchaser Questionnaire in order to exempt itself from registering the sale of the Shares by selling only to an accredited investor.

28. However, in order for the sale of the securities to fall under the exemption of the Securities Act of 1933 registration requirements, the entity must file a notice of an exempt offering of securities with the Security and Exchange Commission ("SEC"), by filing Form D within 15 days after the first sale of securities in the offering. In this case, the Company did not file the exemption with the SEC. No Form D has been filed with the SEC claiming the exemption and the company does not appear in the SEC IDEA database. Reg D, 17 CFR §230.501 et seq.

29. Since the security is not exempt from registration under Federal laws s. 4(1) of the Securities Act of 1933, it its therefore not exempt under Florida law and it was sold under violation of Fla. Stat. 517.07.

WHEREFORE, Plaintiff demands judgment for rescission of the Agreement and damages against Defendants for restitution of the Purchase Price pursuant to the

Securities Act of 1933 and Fla. Stat. 517.07, and reasonable attorneys fees pursuant to Fla. Stat. 517.211(6).

COUNT II

VIOLATION OF THE ANTIFRAUD PROVISIONS OF FEDERAL AND FLORIDA SECURITIES LAWS

30. The allegations of paragraphs 1 through 28 are repeated as if fully set forth herein.

31. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78j(b).

32. Furthermore, SEC Rule 10b-5 implements Section 10(b) by declaring it unlawful, "in connection with the purchase or sale of any security," "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. 240.10b-5.

33. However, the Promoter, Issuer and Promoter De Fortuna and Promoter

Bianchi made representations to Plaintiff as stated on paragraphs 13 to 21 of this Complaint, in order to manipulate, use as a deceptive devise, and defraud Blanco into purchasing the shares of the Company in violation of 15 U.S.C. 78j(b) and 17 C.F.R. 240.10b-5.

WHEREFORE, Plaintiff demands judgment for rescission of the Agreement and damages against Defendants for restitution of the Purchase Price pursuant to the Securities Act of 1933 and Fla. Stat. 517.07, and reasonable attorneys fees pursuant to Fla. Stat. 517.211(6).

## COUNT III
## PAYMENT OF COMMISSIONS IN VIOLATION OF FEDERAL AND FLORIDA LAWS

34. The allegations of paragraphs 1 through 32 are repeated as if fully set forth herein.

35. As per Fla. Stat. 517.021(6)(b)(6) the offering can only be made by a "bona fide" employee of the issuer who "has not participated in the distribution or sale of any securities within the preceding 12 months and who primarily performs, or is intended to perform at the end of the distribution, substantial duties for, or on behalf of, the issuer other than in connection with transactions in securities." Therefore, a sales person of the Promoter such as Promoter Bianchi or any of Promoter real estate agents, who primarily deal with the sales of these investment alternatives to real estate

purchases for Promoter, would not qualify as a bona fide employee of the Issuer. Therefore, any compensation received by Promoter Bianchi for the sale of the Shares is a compensation given in violation of Fla. Stat. 517.061(11)(a)(4) and 517(12).

36. Furthermore, it is well known in the local south Florida real estate community that Promoter De Fortuna through Fortune pays real estate brokers, who are not licensed as a Florida dealer, five (5%) commission for every investor brought to Fortune to invest in investment projects such as the Company in violation of Fla. Stat. 517.061(11)(a)(4) and 517(12).

37. More specifically, Blanco received information that the wife of Mauricio Armando, a Florida licensed real estate salesperson, received compensation in the form of a commission for the investment that Blanco made in the Company. Since this individual is not also a licensed Florida dealer, the commission she received for bringing in Blanco as an investor was done in violation of Fla. Stat. 517.061(11)(a)(4) and 517(12).

38. In addition, if the Company is relying in the exemption from registration based on having less than 35 purchasers (not including accredited investors), then commissions cannot be paid either to "*dealers*" defined as "persons directly compensated or controlled by the issuer engaging, either for all or part of her or his time, directly or indirectly, in the business of offering or selling securities which are issued or are proposed to be issued by the issuer." Therefore, Promoter's employees

who in the nature of their job description have participated in the sale of projects as investment sales would not qualify to receive commissions, such is the case of Promoter Bianchi and Promoter De Fortuna. Such compensation is made in violation of Fla. Stat. 517.061(11)(a)(4) and 517(12).

WHEREFORE, Plaintiff demands judgment for rescission of the Agreement pursuant to Fla. Stat. 517.211, damages against Defendants for restitution of the Purchase Price, and reasonable attorneys fees pursuant to Fla. Stat. 517.211(6).

## COUNT IV
## MISREPRESENTATION IN VIOLATION OF FLORIDA LAWS

39. The allegations of paragraphs 1 through 37 are repeated as if fully set forth herein.

40. Defendants made misrepresentations of fact to Plaintiff as detailed on Paragraphs 13 to 21 of this Complaint in violation of Fla. Stat. 517.301. In addition, and also in violation of in violation of Fla. Stat. 517.301, Defendants did not disclose any material changes in the status of the Project that would have changed the value of the investments and Plaintiff's decision in continuing with the investment.

41. Defendants know or should have known of the statements orally represented to Blanco would be relied upon by her in her decision to purchase the shares in the Company.

42. The misrepresentation of the Defendants has damaged Plaintiff by relying on those statements as a basis of making an investment decision in the Company.

WHEREFORE, Plaintiff demands judgment for rescission of the Agreement pursuant to Fla. Stat. 517.211 and Securities Act of 1933 and damages against Defendants for restitution of the Purchase Price pursuant to the Securities Act of 1933, interest, reasonable attorney's fees and costs pursuant to Fla. Stat. 517.211(6).and any other damages as granted by this Honorable Court.

COUNT V
ACCOUNTING AGAINST ISSUER

43. The allegations of paragraphs 1 through 41 are repeated as if fully set forth herein.

44. Blanco is a shareholder of the Issuer and therefore is entitled to an accounting of all records related to the management and running the business of the Issuer for the purpose of ascertaining how issuer has invested the money invested by Blanco in the Issuer. Fla. Stat. § 607.1602

45. Issuer has only provided in two instances over the last five (5) years a detailed accounting of some of the expenses and allocation of costs of the Issuer.

46. Blanco is requesting the accounting records in order to protect her interest as a shareholder of Issuer given that Promoter Bianchi represented on the last meeting

with Blanco that the Company had lost most of its investment including the land, which was the most significant asset owned by the Company.

WHEREFORE, Plaintiff demands judgment for an accounting against Issuer pursuant to Fla. Stat. § 607.1602.

COUNT VI
FRAUD IN THE INDUCEMENT AGAINST PROMOTER DE FORTUNA AND FORTUNE

47. The allegations of paragraphs 1 through 45 are repeated as if fully set forth herein .

48. Defendants Promoter De Fortuna and Fortune represented by Promoter De Fortuna and Promoter Bianchi made misrepresentations of fact to Plaintiff as detailed on Paragraphs 13 to 21 of this Complaint, which are material facts that induced Blanco to make the investment in the Company.

50. Defendants Promoter De Fortuna and Fortune made those representations knowing that they were not accurate or knowing them to be false.

51. Defendants Promoter De Fortuna and Fortune made such statements or around November 2004 , at the meetings with Blanco at Fortune's Brickell office located in Miami, Florida.

52. Defendants Promoter De Fortuna and Fortune made such statements in order to induce Blanco to rely on them and invest in the Company.

53. Blanco has suffered injury in being deprived of the Purchase Price and the interest she could have accrued on that amount in reliance on the representation that she would at least double her initial investment or Purchase Price and would be able to purchase a unit in the development project at "investor's" preferred price.

WHEREFORE, Plaintiff demands judgment for rescission of the Agreement and damages against Defendants for restitution of the Purchase Price interest, reasonable attorney's fees and costs and reasonable attorneys fees pursuant to Fla. Stat. 517.211(6) and any other damages as granted by this Honorable Court.

Respectfully Submitted,

*Vazquez & Associates*
1401 Brickell Ave.
Suite 500
Miami, FL. 33131
(305) 371-8064

By:_________________________
Gerardo A. Vazquez, Esq.
Florida Bar No.: 6904
Attorney for Plaintiff

ATTACHMENT / EXHIBIT ______

EXHIBIT A

## SUBSCRIPTION AGREEMENT

MIAMI BEACHFRONT INVESTMENTS, LLC
1300 Brickell Avenue
Miami, FL 33131

Silvia Blanco R.:

The undersigned (the Purchaser") desires to purchase from MIAMI BEACHFRONT INVESTMENTS, LLC, a Florida Limited Liability Company (the "Company"), and the Company hereby desires to sell to the Purchaser, one or more units of membership interests of the Company (collectively, the "Units"), on the terms and conditions set forth in this Subscription Agreement (the "Agreement"). The Purchaser understands that the Company is relying upon the accuracy and completeness of the information contained in this Agreement in complying with its obligations under state and federal securities laws.

1. **Subscription.** The Purchaser hereby subscribes for and agrees to purchase and acquire from the Company the number of Units of the Company as set forth on the signature page hereto, each unit of interest in the Company entitling the owner thereof to a zero point zero one percent (0.01%) interest in the profits and losses of the Company. The aggregate purchase price payable by the Purchaser for the Units shall be US$362,500.00 (the "Purchase Price"). The Purchaser represents that, at the time of or simultaneously with delivery to the Company of this Agreement duly completed and signed by the Purchaser, the Purchaser has tendered payment to the Company of the full amount of the Purchase Price.

2. **Acceptance of Subscription.** The Purchaser agrees that, prior to the Closing (as defined below), the Company, in its sole discretion, has the unrestricted right to accept or reject this and any other subscription from the Purchaser for the Units, in whole or in part.

3. **Closing.** The closing of the purchase and sale of the Units shall take place on or as of the date on which the Company accepts the Purchaser's subscription, in its sole discretion, by counter-signing this Agreement below, and accepts and receives the Purchaser's payment of the Purchase Price (the "Closing").

4. **Delivery of Units.** On or after the Closing, the Company will deliver to the Purchaser the Units against payment of the Purchase Price by the Purchaser and/or the disbursement of such payment to the Company at the Closing, in one or more certificates dated the date of the Closing and registered in the name of the Purchaser.

5. **Representations and Warranties.** As a material inducement to the Company's entering into this Agreement and issuing the Units, the Purchaser hereby represents, warrants and acknowledges to the Company as follows:

(a) The Purchaser understands that the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and that, accordingly, the Units

cannot be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of, unless such Units are registered under the Securities Act, or if in the opinion of counsel satisfactory to the Company, such sale, transfer, pledge, hypothecation, assignment or disposition is exempt from such registration requirements. The Purchaser acknowledges that the Units will bear a restrictive legend with respect to the foregoing. The Purchaser understands that there is no public market for any of the Units and no assurance can be given that any public market will ever develop, or if developed that any such market will be sustained. The Purchaser understands that the Purchaser may have to hold the Units for an indefinite period of time, and that the Purchaser might have to bear the complete economic loss of its investment in the Company.

(b) The Purchaser is fully aware and understands that an investment in the Company is speculative in nature and involves substantial risks, including but not limited to, those risks described in "Risk Factors" set forth in Exhibit A to this Agreement. The Purchaser represents and warrants that it has fully read and understands the risks described in "Risk Factors" set forth in Exhibit A to this Agreement as they relate to an investment in the Company.

(c) The Purchaser represents that it has the capacity to protect its own interests in connection with the transactions contemplated by this Agreement. The Purchaser is a sophisticated investor by virtue of, among other things, prior investments made by the Purchaser or on the Purchaser's behalf or through entities which the Purchaser, alone or with others, controls. The Purchaser, by or through its principals or other individuals responsible for making investment decisions on behalf of the Purchaser, is capable of making an informed business decision with respect to an investment in the Company.

(d) The Purchaser represents that it has consulted with and relied upon its own investment, legal, financial and tax advisors in order to review and evaluate the tax, economic and other possible risks and/or benefits of an investment in the Company, including, whether the acquisition of the Units will result in any adverse tax consequences to the Purchaser.

(e) The Purchaser represents that it is an "accredited investor" as the term is defined in Rule 501 of Regulation D under the Securities Act, and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company.

(f) The Purchaser is acquiring the Units for its own account and not with a view toward further distribution in a manner which would violate the Securities Act. Neither the Purchaser, nor any person or entity acting on its behalf has taken or will take any action in connection with the transactions contemplated by this Agreement or the sale or issuance of the Units which would subject the issuance or sale of the Units to the provisions of Section 5 of the Securities Act.

(g) The Purchaser has sufficient available financial resources to provide adequately for the Purchaser's current needs, including possible personal contingencies.

(h) The Purchaser has been furnished any and all materials and information relating to the Company and its activities, the Units, or anything set forth in the Agreement

which the Purchaser has reasonably requested and which the management of the Company has been able to acquire without unreasonable effort or expense.

(i) The Purchaser has been given access to all requested Company documents, books, records, and other information, and has had adequate opportunity to ask all questions which it has deemed necessary or appropriate of, and receive answers from, the Company's officers, employees, agents and representatives, concerning the Company and its business and the Units.

(j) The Purchaser has had the opportunity to conduct, and has conducted, its own independent investigation of the merits and risks of an investment in the Company and in the Units, and has consulted all third parties (including legal and tax advisers) and considered all other facts and circumstances that it has deemed necessary or appropriate to consult and consider, in connection with making an investment decision with respect to the Company and the Units.

(k) The Purchaser acknowledges receipt of this Agreement, the Purchaser Statement, the Purchaser Questionnaire and the Risk Factors set forth in Exhibit A to this Agreement (collectively, the "Subscription Documents"). The Purchaser has not relied upon any information or representations concerning the Company or the Units, written or oral, in making the decision to purchase the Units, other than that contained in the Subscription Documents.

(l) The Purchaser understands that any projections provided to Purchaser by the Company in connection with the purchase of the Units, including, but not limited to, any projections of income and/or profits of the Company, are speculative, and involve forward-looking statements not based on historical facts. Any such projections must be viewed as hypothetical, and no such projections may be relied upon. Because any such projections involve risks and uncertainties, the Purchaser understands that the actual results of the Company may differ materially from those expressed by the projections. The Purchaser acknowledges that it understands the risks described in "Risk Factors" set forth in Exhibit A to this Agreement. No representations or warranties, written or oral, have been made to the Purchaser, or to the Purchaser's advisors, by the management of the Company with respect to the business or future prospects of the Company, the financial condition of the Company, and/or the economic, tax, or any other aspects or consequences of an investment in the Units.

(m) The Purchaser acknowledges that the sale of the Units to the Purchaser pursuant to this Agreement is being made in connection with the Company's offering of units of membership interests in the Company to other investors (the "Offering"). The Purchaser understands and acknowledges that such Offering to other investors may be made at the same or different purchase price per unit of membership interest as is being offered to the Purchaser hereunder and otherwise on the terms and conditions of the respective subscription and other agreements and documents between the Company and such other investors. The Purchaser acknowledges that the Company's sale of units of membership interests in the Offering to such other investors may be consummated in one or in multiple closings, as the Company in its sole discretion shall determine; accordingly, the Company may receive proceeds from the Offering on, before and/or after the date of the Closing. The Purchaser expressly agrees and acknowledges that the Purchaser's obligation to purchase and/or pay for the Units pursuant to the terms of this

Agreement and to otherwise consummate the transactions contemplated hereby is not at all dependent on or subject to the Company's offering or sale, or the closing of the offering or sale, of such other units of membership interests pursuant to the Offering, or the acceptance or receipt of any number of subscriptions or amount of offering proceeds in connection with the Offering.

(n) The Purchaser, if a corporation, partnership, trust or other form of business entity, represents that it is authorized and otherwise duly qualified to invest in and hold the Units. The Purchaser has its principal place of business as set forth on the execution page for subscription by an entity hereto and such entity has not been formed for the specific purpose of acquiring the Units.

(o) The Purchaser acknowledges that the Offering is being offered in a manner that is intended to comply with the requirements of Section 4(2) of the Securities Act and/or Regulation D and/or Regulation S, promulgated under the Securities Act, and that the acceptance of the Purchaser's investment by the Company has been induced by the reliance of the Company on the correctness of the representations contained herein. The Purchaser represents that all the information which the Purchaser has furnished to the Company with respect to its financial position and business experience is correct and complete as of the date of this Agreement and, if there should be any material change in such information prior to the Closing, the Purchaser will immediately furnish such revised or correct information to the Company.

(p) THE PURCHASER UNDERSTANDS THAT THE MERITS OF THE UNITS HAVE NOT BEEN PASSED UPON BY THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE SUBSCRIPTION DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

(q) THE DELIVERY OF THE SUBSCRIPTION DOCUMENTS SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE THEREOF.

(r) NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THE SUBSCRIPTION DOCUMENTS AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

(s) IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE COMPANY, THE PURCHASER HAS (I) RELIED SOLELY ON ITS OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, AND (II) UNDERTAKEN ALL DUE DILIGENCE EFFORTS AND INDEPENDENT INVESTIGATIONS, AND CONSULTED ALL THIRD PARTIES, THAT IT HAS DEEMED NECESSARY OR APPROPRIATE.

(t) The Purchaser hereby represents that it has been informed as follows:

IF APPLICABLE, PURSUANT TO SECTION 517.061(11)(A)(5) OF THE FLORIDA STATUTES, FLORIDA INVESTORS HAVE A THREE-DAY RIGHT OF RESCISSION. IF A FLORIDA INVESTOR HAS EXECUTED A SUBSCRIPTION AGREEMENT, THE INVESTOR MAY ELECT, WITHIN THREE BUSINESS DAYS AFTER SIGNING THE SUBSCRIPTION AGREEMENT OR BEING FIRST NOTIFIED OF THIS RIGHT, WHICHEVER IS LATER, TO WITHDRAW FROM THE SUBSCRIPTION AGREEMENT AND RECEIVE A FULL REFUND AND RETURN (WITHOUT INTEREST) OF ANY MONEY PAID BY THE INVESTOR. A FLORIDA INVESTOR'S WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH SUCH WITHDRAWAL, A FLORIDA INVESTOR NEED ONLY SEND A LETTER OR TELEGRAM TO THE COMPANY AT THE ADDRESS SET FORTH IN THESE SUBSCRIPTION DOCUMENTS INDICATING THE INVESTOR'S INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM MUST BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IF A FLORIDA INVESTOR SENDS A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE COMPANY TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME AND DATE WHEN IT IS MAILED. SHOULD A FLORIDA INVESTOR MAKE THIS REQUEST ORALLY, THE INVESTOR SHOULD ASK FOR WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED.

(u) The Purchaser understands that (i) the Company is being formed for the purpose of participating in a joint venture between the Company and Seville Beach Hotel Corporation (the "Partner") named 2901 Beach Ventures LLLP, a Florida limited liability limited partnership (the "Joint Venture"), (ii) the primary purpose of the Joint Venture is to develop, market and sell units in a real estate condominiums project (the "Project"), (ii) the Company and the Partner will each have a 49% equity interest in the Joint Venture, and Miami Beachfront GP, LLC and Lionstone Seville GP, the general partners of the Partnership will each hold the remaining 1% interests in the Partnership, (iii) the Joint Venture's partnership agreement (the "Partnership Agreement") will govern all matters relating to the management and operation of the Project, including, but not limited to, the distribution of the profits, if any, of the Project, and (iv) the rights of the Company with respect to the Project and, in turn, of investors in this Offering, will be governed by and subject in full to the terms of the Partnership Agreement.

(v) The Purchaser represents that (i) it has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, (ii) it has taken all actions necessary to authorize its execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby, and (iii) this Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms (except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws).

(w) There are no suits, actions, investigations or other proceedings pending or threatened against or affecting the Purchaser, at law or in equity, or before or by any governmental or administrative agency or instrumentality which, if adversely determined, would have an adverse effect upon the financial condition of the Purchaser or upon the Purchaser's investment in the Company.

(x) The Purchaser has no indebtedness other than indebtedness incurred in the ordinary course, none of which is delinquent.

(y) The Purchaser is not involved in any bankruptcy, reorganization, insolvency or similar proceedings.

(z) The Purchaser represents that its principal residence is listed on the signature page hereof.

6. **Benefit of Representations, Warranties and Statements.** The Purchaser expressly acknowledges and agrees that the representations, warranties and statements of the Purchaser set forth in this Agreement are being made for the benefit of, and may be relied upon by, the Company and the Manager of the Company (the "Manager"), the present and future controlling parties of the Company and the Manager and their other affiliates, including, but not limited to, any of their officers, directors, employees and/or shareholders.

7. **Covenants.**

The Purchaser understands that the Purchaser will be subject to the terms and conditions of the Limited Liability Company Operating Agreement of the Company (the "Operating Agreement"). The Operating Agreement will place substantial restrictions on the Purchaser's investment and ownership of the Units including, but not limited to, the Purchaser's ability to transfer the Units. The Operating Agreement also restricts the Purchaser's ability to control the business and operations of the Company. The Purchaser agrees that, during such time as the Purchaser holds any Units, the Purchaser will adhere to and comply with the terms and conditions of the Operating Agreement.

8. **Indemnification.** The Purchaser agrees to indemnify and hold harmless the Company, the Manager and any of their officers, directors, agents, professional advisors, affiliates and successors, from and against all liability, damage, losses, costs and expenses (including reasonable attorneys' fees) which they may incur by reason of: (i) the breach by the Purchaser of any representations, warranties or covenants made by the Purchaser in this Agreement, or in any other document provided by the Purchaser to the Company or the Manager, or any of their affiliates, in connection with the Purchaser's purchase of the Units; or (ii) the provision by the Purchaser of any false, inaccurate or misleading information to the Company or the Manager, or any of their affiliates, in connection with the Purchaser's purchase of the Units.

9. **Arbitration.** Any, dispute controversy or claim arising out of or relating to this Agreement must be settled by binding arbitration (the "Arbitration") according to the Rules of Conciliation and Arbitration (the "Rules") of the International Chamber of Commerce (the "ICC") by one or more arbitrators appointed in accordance with the Rules, as such Rules may be modified from time to time. The Arbitration shall be legally binding, shall take place in, Miami,

Florida and shall be conducted in the English language. The arbitral award or order (the "Award") shall be given in writing in English, and shall detail the disputed matters and the reasons upon which the Award is based. The Award shall be final and binding upon the parties and shall not be subject to appeal to any court or other authority. Each party shall bear its own costs and expenses in connection with the Arbitration, but the parties shall share equally in the costs and fees of the Arbitration proceedings. Judgment upon the Award may be entered in any court of competent jurisdiction, and application may be made to any such court for enforcement thereof. The parties agree that any federal or state court situated in Miami, Florida shall be a court of competent jurisdiction for such purpose. Process in any such action or proceeding may be served on any party anywhere in the world. Each party waives any defense or objection that it could have in relation to diplomatic immunity, lack of in personam and subject matter jurisdiction, improper venue or competence in any Arbitration, or in any action or proceeding seeking judgment or enforcement of an Award hereunder.

10. **Miscellaneous.** This Agreement, upon acceptance by the Company, in its sole discretion, shall be binding upon the heirs, executors, administrators, successors and assigns of the undersigned. The Purchaser may assign its rights and obligations under this Agreement upon the Company's prior written consent, which the Company may grant or withhold in its sole discretion. This Agreement shall be construed in accordance with and governed in all respects by the laws of the State of Florida without application of the principles of conflicts of laws. This Agreement and all related executed documents contain the entire agreement between the parties with respect to the transactions contemplated herein and supersede all prior agreements, understandings, negotiations and discussions, both written and oral, among the parties hereto with respect to the subject matter hereof. In the event of a conflict between this Agreement and any other document relating to the subject matter hereof, the provisions of this Agreement shall prevail. This Agreement may not be amended or modified in any way except by a written instrument executed by each of the parties hereto. In the event that any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement will not in any way be affected or impaired thereby. This Agreement may be signed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same instrument.

**[SIGNATURES ON THE FOLLOWING PAGE]**

EXECUTION PAGE FOR SUBSCRIPTION BY AN INDIVIDUAL
(Not applicable to subscriptions by entities)

**Effective only if signed on or before Nov. 1st, 2004**

IN WITNESS WHEREOF, subject to acceptance by the Company, the undersigned has completed this Agreement to evidence its subscription, effective Nov. 1st, 2004.

Number of Units subscribed for: 102 Units, representing a one point zero two percent (1.02%) interest in the Company

Amount: $362,500.00

Very truly yours,

Signature

Silvia Blanco R.
(Name)

Address:

Social Security Number (if Applicable):

**AGREED TO AND ACCEPTED:**

**MIAMI BEACHFRONT INVESTMENTS, LLC,**
**a Florida Limited Liability Company**

By:
Name: Edgardo Defortuna
Title: President

{M2150561;1}

EXHIBIT A

**RISK FACTORS**

MIAMI BEACHFRONT INVESTMENTS, LLC (THE "COMPANY") IS A COMPANY FORMED PRIMARILY FOR THE PURPOSE OF PARTICIPATING IN A JOINT VENTURE TO DEVELOP A REAL ESTATE CONDOMINIUMS PROJECT (THE "PROJECT"). THE PROJECT WILL SEEK TO DEVELOP, MARKET AND SELL CONDOMINIUM OWNERSHIPS (THE "OWNERSHIPS") EITHER TO INDIVIDUAL BUYERS IN THEIR ENTIRETY ON AN UNDIVIDED BASIS (THE "FULL OWNERSHIPS") OR TO MULTIPLE BUYERS THROUGH FRACTIONAL OWNERSHIP INTERESTS, A FORM OF OWNERSHIP WHICH ALLOWS SEVERAL PARTIES TO SHARE THE BENEFITS AND COSTS OF THE OWNERSHIP OF A SINGLE CONDOMINIUM UNIT (THE "FRACTIONAL OWNERSHIPS"). THE NAME OF THE JOINT VENTURE IS 2901 BEACH VENTURES, LLLP, A FLORIDA LIMITED LIABILITY LIMITED PARTNERSHIP (THE "JOINT VENTURE"), AND THE COMPANY'S PARTNER IN THE JOINT VENTURE IS SEVILLE BEACH HOTEL CORPORATION (THE "PARTNER").

AN INVESTMENT IN MEMBERSHIP INTERESTS (THE "UNITS") OF THE COMPANY IS HIGHLY SPECULATIVE AND INVOLVES SIGNIFICANT RISKS, INCLUDING, THE RISK OF LOSS OF THE ENTIRE INVESTMENT. IT IS NOT POSSIBLE TO FORESEE AND DESCRIBE ALL OF THE RISKS WHICH MAY AFFECT THE COMPANY. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THE RISKS AND UNCERTAINTIES DESCRIBED BELOW IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE COMPANY. HOWEVER, THE RISKS SET FORTH BELOW ARE NOT PRESENTED IN ANY PARTICULAR ORDER, ARE ILLUSTRATIVE ONLY AND ARE NOT TO BE CONSIDERED OR DEEMED EXHAUSTIVE OR DEFINITIVE OF ALL OF THE MATERIAL RISKS INVOLVED IN CONNECTION WITH AN INVESTMENT IN THE COMPANY.

**The Real Estate Market is Cyclical and Highly Sensitive to Economic Conditions**

Real estate investments are subject to various risks. The real estate market is cyclical and is highly sensitive to changes in general economic conditions, such as employment levels, inflation, consumer demand for housing, consumer income, interest rate levels and the availability of construction financing. The Project will be subject to these conditions as well as to local economic conditions, such as the supply of alternative properties in the areas where the Project is located, the attractiveness of the Ownerships in the Project to potential buyers, the affordability of Ownerships in the Project relative to that of alternative properties, the resale market for Ownerships in the area of the Project, the rental market for Ownerships in the Project, competition from available properties located in the area of the Project, changes in zoning laws, increased real estate taxes, the availability of home financing programs and the favorability of interest rates. In addition, a significant percentage of the Project's Ownerships will likely be second home purchases which are particularly sensitive to general and local economic conditions. Apart from economic conditions, the Project may also be subject to real estate-specific risks such as an inability to sell Ownerships on acceptable terms, cancellations of sales

contracts and the inability of prospective buyers to qualify for mortgage loans. Profits from an investment in the Project, if any, will generally depend on the sales price of the Ownerships developed by the Project and the amount of Ownerships sold, as offset by the Project's land acquisition costs, construction and development expenses, sales and marketing costs, debt service and other related expenses. If, for any reason, including, but not limited to, as a result of a downturn in general or local economic conditions or due to other circumstances which affect real estate investments, the Project does not generate income sufficient to meet its costs and expenses, the Company's financial results will be materially adversely affected.

**Fractional Ownerships are a Relatively New Real Estate Investment Concept and are Therefore Subject to Additional Risks**

It is anticipated that approximately 35% of the revenues of the Company will come from the sale of Fractional Ownerships, a form of ownership which allows several parties to share the benefits and costs of the ownership of a single condominium unit. Because Fractional Ownerships have only recently begun to emerge as real estate investments, they do not enjoy the same time-tested advantage of more traditional real estate investments, such as typical condominium units. Due to the relative novelty of Fractional Ownerships, until all of the Fractional Ownerships in the Project are sold, the Project is subject to the risk that Fractional Ownerships may fail to gain popularity due to several factors including, but not limited to, the relative cost of Fractional Ownerships as compared to other investment alternatives and whether Fractional Ownerships generally achieve acceptance as desirable investments. If Fractional Ownerships do prove to be unattractive real estate investments before all of the Fractional Ownerships are sold, the Project may not sell enough Fractional Ownerships to generate sufficient income to meet its costs and expenses, and the Company's financial results will be materially adversely affected.

**Your Rights will be Subject to the Terms of the Joint Venture's Partnership Agreement; Disagreements between, or Non-Performance by, the General Partners in the Joint Venture Could Have a Material Adverse Effect**

The Project is being co-developed through the Joint Venture between the Company and the Partner. The Company and the Partner will each have a 49% equity interest in the Joint Venture, and Miami Beachfront GP, LLC and Lionstone Seville GP, the general partners of the Joint Venture (the "General Partners") will each hold the remaining 1% interests in the Joint Venture. The Joint Venture's partnership agreement (the "Partnership Agreement") will govern all matters relating to the management and operation of the Project, including, but not limited to, the distribution of the profits, if any, of the Project. Accordingly, the rights of the Company with respect to the Project and, in turn, of investors in this Offering, will be governed by and subject in full to the terms of the Partnership Agreement.

In addition, the Partnership Agreement generally provides that the General Partners will equally share voting control on all significant matters to come before the Joint Venture. In the event that the General Partners disagree on the resolution of any matter to come before the Joint Venture, or on the management or conduct of the business of the Joint Venture in general, such disagreement may not be resolved in the Joint Venture's favor, which could have a material

adverse effect on the Company's business, financial condition and results of operations. Additionally, any failure by either General Partner to fulfill its duties and obligations to the Joint Venture could have a material adverse effect on the success of the Project and, as a result, on the Company.

**The Company Must be Able to Meet its Financing Obligations; Financing for the Project's Various Stages May Not be Available; Investments are Not Contingent on Other Investments**

The Company plans to finance the acquisition, development and construction of the Project with equity raised from the offering of Units to investors, as well as with debt financing. The debt financing will likely be borrowed from one or more banks, institutional lenders, mezzanine investors or other private entities, be secured by mortgages and other liens on the assets of the Company, and may be structured so as to provide the lenders with an equity participation in the profits, if any, of the Company. Principal and interest payments by the Company on indebtedness for borrowed money to finance the acquisition, development and construction of the Project will be required to be made when due, regardless of the amount of income from the Project. If payments are not made by the Company to creditors when due or the Project is otherwise unable to meet its financing obligations, the Company may sustain a partial or total loss of its investment in the Project as a result of a foreclosure of a mortgage or other security instrument held by a secured creditor or the sale of the Project to satisfy a judgment obtained by an unsecured creditor. Such a foreclosure or sale could result in substantial losses to the members of the Company, as well as adverse income tax consequences.

The Company plans to raise capital for the Project in various stages that will generally coincide with the acquisition of the land for the Project, the sale and marketing of Ownerships on a pre-construction basis in the Project and the construction and development of the Project. The proceeds of this Offering will be insufficient to meet the Company's capital needs for all of the stages of the Project and there can be no assurance that such additional required capital will be available in the future. The inability of the Company to fund any stage of the Project on favorable financial terms could have a material adverse effect on the Company. In addition, no investment in the Company is contingent on any other investment in the Company. As a result, the failure by the Company to obtain sufficient capital for the purchase of land for the Project could result in a partial or total loss of an investment by investors who purchase Units prior to the closing of the purchase of the land by the Company. Moreover, the Company's failure to raise adequate funds to complete any phase of the construction and development of the Project, through construction loan financing, equity investment or any other means, would have a material adverse effect on any investments made by investors who purchased Units during or prior to that phase..

**The Success of the Project May Depend on The Ritz Carlton Allowing the Partnership to Sell and Market the Project Using the Ritz Carlton Name as the "Flag" of the Project**

It is crucial to the success of the Project that the use of a recognizable and elite "Flag" brand be acquired for the Project. The Company intends to seek to use The Ritz Carlton name as the "Flag" for the Ownerships being developed by the Company. In the event that the Company

does not secure an agreement allowing the Project to use The Ritz Carlton name as the "Flag" by or before December 31, 2004, the Manager may dissolve the Company. Many factors may influence whether and when an agreement is reached with The Ritz Carlton, and accordingly, the Project faces the risk that an agreement may not be timely reached. In the event that no agreement is reached and the Company is dissolved, then, the Manager shall cause to be returned in cash, an amount equal to one hundred percent (100%) of the amount of money contributed to the Company by its Members (excluding any administrative and structuring fees paid to any affiliate of the Manager which shall be non refundable) within thirty (30) days from the date of dissolution reduced by all documented costs incurred by the Company to unaffiliated third parties from the date of organization of the Company through the date of such payment. Such reduction shall in no event exceed two hundred fifty thousand dollars ($250,000.00) in the aggregate.

**The Company May Rely on Third Parties for the Construction and Development of the Project**

The Company does not directly engage in the construction and development of real estate and will rely on various third party service providers and suppliers for the completion of the Project, including, but not limited to, a third party general contractor. The ability of these third parties and suppliers to complete the construction and development of the Project will be subject to typical construction and development risks, as well as acts of war, work stoppages, interruptions in transportation systems and other force majeure events. The failure of the general contractor, or any other third party, to complete the Project in a timely manner, and at the cost projected by Fortune International Management, Inc., the Manager of the Project (the "Manager"), could have a material adverse effect on the financial results of the Company.

**There May be Problems and Delays in the Construction of the Project**

There are various risks associated with the construction activities of the Project, including, but not limited to, the inability to obtain building or zoning permits, construction delays, the inability to complete construction at projected costs and to fund any excess construction costs, work strikes or stoppages, adverse weather conditions, the inability to refinance construction financing on favorable terms or to meet preconditions for permanent financing, unforeseen environmental or engineering problems, natural disasters, and other conditions beyond the control of the Company, any of which could substantially delay, or increase the costs of, the construction of the Project and materially adversely affect the Company's financial results. In addition, the residential homebuilding industry has, from time to time, experienced fluctuating prices, as well as shortages, of labor and construction related materials, including, lumber, insulation, drywall, concrete, carpenters, electricians and plumbers. Any price increase or unavailability of labor or materials required for the construction and development of the Project could have a material adverse effect on the financial results of the Company. If there are unforeseen events like bankruptcy of, or an uninsured or under-insured loss claimed against, the Project's general contractor, the Company may become responsible for the losses or other obligations of the general contractor. Should losses in excess of insured limits occur, the losses could materially adversely affect the financial results of the Company.

**Increased Interest Rates Could Affect Sales of Ownerships in the Project**

Many buyers of condominiums in the Project will likely obtain mortgage loans to finance a substantial portion of the purchase price of their Ownerships. In general, housing demand is adversely affected by increases in interest rates and by decreases in the availability of mortgage financing. In addition, there have been discussions of possible changes in the federal income tax laws which would remove or limit the deduction for home mortgage interest. If effective mortgage interest rates increase and the ability or willingness of prospective buyers to finance home purchases is impaired, sales of the Project's Ownerships and, consequently, the Company's financial results, could be materially adversely affected.

**The Project will Compete with Alternative, Comparable Properties for Buyers**

The residential real estate market is highly competitive. In order to attract the Project's target demographic buyers, the Project will be located in a developed area where there will be alternative properties comparable to the Ownerships in the Project for sale. Competition from such other properties, or from other available properties generally, may affect the Project's ability to attract and retain buyers. The entities with which the Company may be competing may have greater resources than the Company or more experienced management than the Manager of the Project.

**The Project May Not be Profitable or May Not be Able to Make Member Distributions**

There is no assurance that the development of the Project will be profitable or whether or when the Project will generate cash flow available for distribution to the Company's members. It is anticipated that the Company's primary source of cash available for distribution to members will be revenues from the sale of Ownerships. The future sale of Ownerships in the Project may be adversely affected by changes in both general and local economic conditions, the attractiveness of the Ownerships to potential buyers and other factors, including, but not limited to, those factors described in these Risk Factors. In addition, the Manager is authorized, among other things, to incur indebtedness for borrowed money on behalf of the Company from banks, institutional lenders, mezzanine investors or other private entities, to pay costs and expenses incurred in conducting and completing the Company's activities (including, but not limited to, any costs and expenses related to this Offering) and to establish and maintain reserves for working capital, taxes, insurance and others costs and expenses. The use of Company funds for such purposes may delay or prevent receipt by the members of available distributions from the Company and may require the members to report and pay tax on income without receiving contemporaneous cash distributions from the Company, even if the Company is profitable. It is possible that, in any given year, a member may incur tax liability attributable to its ownership of Units in excess of the cash distributed to the member by the Company. In such cases, the member would have to use cash from other sources to satisfy the member's tax liability. Prospective investors should consult their tax advisors regarding the circumstances under which they may incur tax liability exceeding the amount of cash received from the Company.

**The Project will be Subject to Substantial Regulation**

The construction, development and marketing of the Project is subject, both directly and indirectly, to substantial federal, state and local regulation. No assurance can be given that existing or future federal, state and local statutes, rules and regulations will not materially adversely affect the financial results of the Company. For example, laws, rules and regulations concerning matters such as, but not limited to, zoning, other land use restrictions, occupancy restrictions, disability laws, environmental protection or required additional equipment or features could have a material adverse effect on the financial results of the Company. Further, no assurances can be made regarding the current or future availability or cost of community facilities, city or county services (e.g., fire and police protection, waste disposal, etc.), or utility services (e.g., water, sewer, storm drainage, telephone, electricity, gas, etc.). Interruption in, changes in or discontinuance of such services or facilities could impair the saleability of Ownerships in the Project and, consequently, have a material adverse effect on the Company.

**The Company's Insurance May Not be Adequate to Cover Losses**

The Company will maintain comprehensive insurance for the Project, including coverage for liability and fire. However, there are certain types of losses, such as earthquakes, hurricanes and other catastrophic events, as well as condemnation and other actions taken by the state, which are either uninsurable or not economically insurable. Any such loss could have a material adverse effect on the financial results of the Company. The Company will obtain title insurance to insure the title to the Project, subject to certain exceptions as will be stated in the policies of title insurance. However, the title insurance only covers certain title risks, and only insures to the respective limits of the title insurance policies. Therefore, there is no title insurance for the value of the Project which exceeds the amount of the title insurance, and the title insurance will be subject to the exceptions and qualifications contained in the title insurance policies.

**Terrorism and The War on Terrorism Could Impact the Project**

As a result of the September 11, 2001 attacks as well as the aftermath of the attacks, a great deal of uncertainty exists in the world today, uncertainty that could have deleterious effects on the world and regional economic markets, including real estate markets. It is impossible to predict what effect terrorist acts, and/or the war on terrorism, could have on the Project.

**The Company Will Generally be Subject to the Decisions and Control of the Manager**

The Company will be managed by the Manager, in its sole discretion. Accordingly, except as otherwise provided in the Operating Agreement of the Company (the "Operating Agreement") or by law, members in the Company will have no right to participate in the management or control of the Company's affairs and no right to cause the Manager to take other actions that may be desired by the members. The decisions of the Manager could materially adversely affect the Company.

**The Success of the Project Depends on the Key Personnel of the Manager**

The Project is dependent on the efforts of the senior management (the "Key Personnel") of the Manager for strategic business direction and real estate experience. The loss of the services of any or all of the Key Personnel could have a material adverse effect on the operations of the Project.

**The Manager's Fees Have Not Been Independently Negotiated**

The Manager and certain of its affiliates will receive fees and distributions of funds from the Company under or as permitted by the terms of the Operating Agreement and/or the Company's budget, including, but not limited to, developer's fees and sales commissions and an ownership interest in the Company which will entitle it to receive a portion of any distributions made by the Company. Although the Manager believes that the amount of such fees as well as its interest in the Company's distributions are just and equitable, the amounts of these fees and potential distributions could be substantial and have not been arrived at through arm's length negotiations.

**The Manager will be Free to Engage in Other Activities, including, Activities Competitive with the Project**

The Manager and its personnel will not be devoted full-time to the supervision and management of the construction and development of the Project; rather they will devote the amount of time that they, in their sole discretion, deem necessary to properly supervise and manage such activities. In addition, the Operating Agreement permits the Manager and each member to engage in whatever activities they choose, regardless of whether such activities are competitive with the Company, without having or incurring any obligation to offer an interest in such activities to the Company or any of its members. As a result, the Manager and its personnel and affiliates may participate in activities unrelated to the Project, including, but not limited to, activities that directly compete with the Project. Such activities may pose conflicts-of-interest for the Manager which may not be resolved in favor of the Company and the members. Moreover, as a result of such activities, the Manager may become subject to the claims of creditors for liabilities unrelated to the Project. These claims could be in amounts which could force the Manager into bankruptcy or receivership, either of which could result in the immediate dissolution of the Company, or otherwise materially adversely impact the Company.

**Allocations to Members May Not be Proportionate to Members' Capital Contributions; The Offering Price of the Units Has Been Arbitrarily Determined and May Not be Related to any Established Criteria of Value**

The form and amount of consideration paid for Units in the Company may vary among members of the Company. Therefore, while allocations to members of the Company, if any, will be equal on a per-membership interest basis, such allocations will not necessarily be equal to the

amount which each member's capital contribution bears in relation to the total amount of capital contributions made by all of the members of the Company.

The offering price of the Units has been arbitrarily determined. The offering price does not bear any relationship to the Company's asset value, net worth, book value, earnings or any other established criteria of value and should not be considered to be an indication of the actual value of the Company or of any current or future market price of the Units. No assurance is or can be given that the Units, if transferred, could be sold for the price at which they are being offered hereby or for any other amount. In addition, depending on various factors, including, but not limited to, the Company's future capital needs and the demand for investments in the Company, prior or subsequent investments in the Company may, in the sole discretion of the Manager, be consummated at lower, higher or equal prices, on a per Unit basis, as those prices at which Units are currently being sold.

**An Investment in the Company May Pose Tax Risks**

There are significant tax risks associated with the acquisition, holding and disposition of the Units. Federal, state and local tax laws and rules relating to limited liability companies and real property acquisitions and the income tax consequences arising therefrom, whether direct or indirect, are complex and, in many cases, uncertain. Some statutory provisions remain to be interpreted by administrative regulations and the Internal Revenue Service (the "IRS") may successfully challenge the tax treatment accorded certain items by the Company. In addition, the federal, state and local income tax statutes, rules and regulations which govern the treatment of the Company and its members are subject to change or modification at any time, either prospectively or retroactively, through the continuous evolution of judicial decisions and administrative interpretations and/or the enactment of new legislation. All prospective investors in the Company should understand that the tax consequences of an investment in the Company are subject to change. In addition to United States federal income tax consequences, investors in the Company may be subject to taxation by state and local tax authorities in the United States, as well as to taxes in foreign jurisdictions. Each prospective investor in the Company should consult with his, her, or its own tax advisor to determine the effect of any federal, state, local or foreign income or other taxes on such investor as a result of an investment in the Company.

The Manager has been designated as the "Tax Matters Partner" pursuant to the Operating Agreement. The Tax Matters Partner has the authority to negotiate, settle and compromise matters with the IRS relating to all members of the Company. As Tax Matters Partner, the Manager may take positions on issues or effect compromises binding on all members which the Manager believes are in the best interests of the Company but which may not be in the best interests of individual members.

**The Loss of the Company's Partnership Status for Income Tax Purposes Would Have a Material Adverse Effect**

The Company was formed under laws of the State of Florida. No ruling will be requested from the IRS that the Company constitutes a partnership for federal income tax purposes. If the Company is deemed to be an association taxable as a corporation, the members of the Company

will not be permitted to deduct on their individual income tax returns the losses, if any, of the Company, profits of the Company will be subject to tax at normal corporate rates and any distributions of the Company, other than liquidating distributions, would, to the extent of the Company's current and accumulated earnings and profits, constitute dividends to the members. Accordingly, there would be a substantial reduction in after tax cash flow to the members from their investment in the Company.

**The Company's Accounting Method Could be Challenged**

The Company intends to use the cash receipts and disbursements method of accounting. It is possible that the IRS would require the Company to use the accrual method of accounting. In general, the most significant effect of such change would be to require the Company to recognize income earlier than such income would be recognized under the cash method which, in turn, could result in each member being allocated income without the Company having the corresponding cash. There is no assurance that the IRS will not audit the Company and require it to change to the accrual method of accounting, which change could be required to be made retroactively.

**The Company's Allocations May be Disregarded**

The Operating Agreement contains complex allocations. There can be no assurance that such allocations will be respected for federal income tax purposes by the IRS. Depending on which allocations were to be disregarded, the members' share of income, gains, losses, deductions and credits of the Company could be materially adversely affected.

**The Company and its Members Could Be Audited**

Federal income tax returns filed annually by the Company may be audited by the IRS, and such audits may result in adjustments to the various items of the members' income, loss, deduction and credit reported thereon and the allocation thereof between the Company, the Manager and the members. An audit of the tax return of the Company may result in an audit of a member's individual tax return. No assurance can be given that such an audit will not occur or that a member will not incur additional liability and costs as a result of any such audit, including, but not limited to, attorney's fees, court costs and other expenses in connection with the contesting of any proposed deficiency asserted by the IRS. None of these costs and expenses will be reimbursed by the Company.

**An Investment in the Company will Generally be Non-Transferable and Illiquid**

The Operating Agreement and the Subscription Agreement for the Units impose certain restrictions on the transfer, sale, gift or pledge of the Units. In addition, transfers of Units are limited by state and federal securities laws and may only be made if the Company is reasonably assured that such transfers will not violate the registration provisions of such securities laws, and are in compliance with, the Securities Act of 1933, as amended (the "Securities Act"). As a result, holders of Units may be precluded from transferring their Units and must be able to bear the economic risk of a complete loss of their investment in the Company. In addition, there is no

current trading market for the Units and it is not anticipated that any such market will develop. Consequently, an investment in the Units may be illiquid and purchasers may be required to bear the economic risks of the investment for an indefinite period of time. Prospective investors should consider the potentially long-term nature of their investment in the Company.

**Investors in this Offering Will Incur Immediate and Substantial Dilution**

The price at which the Units are being sold in this Offering is substantially higher than the fully-diluted pro forma net tangible book value per Unit of the Company immediately after the Offering. Consequently, investors in this Offering will suffer an immediate and substantial dilution in the net tangible book value per Unit of the Company as compared to the per Unit price that investors in the Offering pay to invest. In addition, the Company may issue and sell additional Units in the future which could cause further dilution to the book value of the Units.

**The Documents Given to Prospective Investors are not Complete**

The Units being offered by the Company through this Offering are only being offered to accredited investors and, accordingly, no private placement memorandum has been prepared and/or distributed to investors. The documents being disseminated to accredited investors are not complete and are not intended to be complete, but are solely intended to briefly describe the business of the Company, summarize certain risks associated with an investment in the Company and provide certain projected financial and other information concerning the Company. Prospective investors are urged to evaluate their own investment in the Company and to ask all relevant questions of the Company and the Manager concerning the Company, its business, the Project and any other related matters. Prospective investors should also consult with their own personal attorneys, accountants and business advisors prior to making any investment decision with respect to the Company.

**Members May be Liable for Improper Distributions**

A member who receives a distribution from the Company in violation of the Articles of Organization, the Operating Agreement or applicable law may in certain circumstances be liable to the Company for the amount of such distribution.

**The Company and the Manager Will Have the Same Legal Representation**

The Company and the Manager will be represented by the same legal counsel. Separate legal counsel for the members will not be retained by the Company. Prospective investors are urged to retain and consult with their own legal counsel and other advisors in connection with evaluating an investment in the Company.

# PURCHASER QUESTIONNAIRE

MIAMI BEACHFRONT INVESTMENTS, LLC
(a Florida Limited Liability Company)

CONFIDENTIAL

This Purchaser Questionnaire is being provided to you in connection with a potential investment in units of membership interests (the "Units") of MIAMI BEACHFRONT INVESTMENTS, LLC, a Florida limited liability company (the "Company"). The purpose of this Purchaser Questionnaire is to determine whether you are an "accredited investor," as such term is defined under the Securities Act of 1933, as amended (the "Securities Act"), and Regulation D, promulgated thereunder.

(1) Name: Silvia Blanco R.

(2) Address:

(a) Home: ____________________

____________________

Telephone: ____________________

(b) Business: ____________________

____________________

Telephone: ____________________

(3) Social Security Number or Federal Tax Identification Number (if Applicable): __________

(4) Occupation or Principal Business: ____________________

(5) Age: ____________________

(6) The following information is required to ascertain whether you would be deemed an accredited investor as defined in Rule 501 of Regulation D, promulgated under the Securities Act. Please check whether you are any of the following:

(a) A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any

Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefits of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

Yes_____ No ✓

(b) A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

Yes_____ No ✓

(c) An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Units, with total assets in excess of $5,000,000;

Yes_____ No ✓

(d) A natural person whose individual net worth, or joint net worth with your spouse, at the time of your purchase of the Units, exceeds $1,000,000;

Yes ✓ No_____

(e) A natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with your spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

Yes ✓ No_____

(f) A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Units, whose purchase is directed by a sophisticated person, as described in Rule 506(b)(2)(ii) of Regulation D; or

Yes_____ No ✓

(g) Any entity in which all of the equity owners are accredited investors.

Yes_____ No ✓

(7) Please provide the following information on your investment, business, and educational experience:

(a) Educational background: ______________________________

(b) Principal employment positions held during last five years: ______________________________

(c) Frequency of prior investment (check one in each column):

| | Real Estate | Stocks & Bonds | Venture Capital Investments |
|---|---|---|---|
| Frequently | | | |
| Occasionally | | | |
| Never | | | |

(8) Do you believe you have sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of this investment?

Yes ✓ No ____

(9) Do you believe you have the financial ability to hold this proposed investment for an indefinite period of time, and to bear the economic risk of a complete loss of this investment?

Yes ✓ No ____

I represent that the foregoing information is true and correct.

Dated: Nov. 1st, 2004

Silvia Blanco R.
(Name of Investor - Please Print)

[signature]
(Signature)

ATTACHMENT / EXHIBIT ______

Spoke to Julie - gvazquez@gvazquez.com on July 17th.

SILVIA BLANCO, an individual,
Plaintiff,

Vs.

MIAMI BEACHFRONT INVESTMENTS, LLC.
A Florida limited liability company,
FORTUNE INTERNATIONAL
REALTY, INC. A Florida Corporation,
EDGARDO DE FORTUNA, an individual,
HUGO BIANCHI, an individual.
Defendants.

_______________________________________/

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND
FOR MIAMI DADE COUNTY,
FLORIDA

CASE NO. 09-49095 CA 25

6/30
2:00 P
Or #M

**SUMMONS**
**PERSONAL SERVICE ON A NATURAL PERSON**

Serve: MIAMI BEACHFRONT INVESTMENTS, LLC
1300 BRICKELL AVENUE
MIAMI, FLORIDA 33131

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. A phone call will not protect you; your written response, including the above case number and named parties, must be filed if you want the Court to hear your case. If you do not file your response on time, you may lose the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff(s)/Plaintiff's Attorney" named below.

VAZQUEZ & ASSOCIATES
1401 Brickell Avenue
Suite 500
Miami, Florida 33131
305-371-8064

THE STATE OF FLORIDA
TO EACH SHERIFF OF THE STATE: You are commanded to serve this Summons and a copy of the Complaint in this lawsuit on the above-named Defendant(s).

DATED ON JUNE JUN 2 9 2009, 2009.

(SEAL)

CLERK OF THE CIRCUIT & COUNTY COURTS
By: Caroline Williams 20904
Deputy Clerk

SILVIA BLANCO, an individual,
Plaintiff,

Vs.

MIAMI BEACHFRONT INVESTMENTS, LLC.
A Florida limited liability company,
FORTUNE INTERNATIONAL
REALTY, INC. A Florida Corporation,
EDGARDO DE FORTUNA, an individual,
HUGO BIANCHI, an individual.
Defendants.

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND
FOR MIAMI DADE COUNTY,
FLORIDA

CASE NO.

09-49095 CA 25

6/30
7:00P
CO #155

______________________________________/

**SUMMONS**
**PERSONAL SERVICE ON A NATURAL PERSON**

Serve: FORTUNE INTERNATIONAL REALTY, INC.
2666 BRICKELL AVENUE, 3RD FLOOR
MIAMI, FLORIDA 33129

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. A phone call will not protect you; your written response, including the above case number and named parties, must be filed if you want the Court to hear your case. If you do not file your response on time, you may lose the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff(s)/Plaintiff's Attorney" named below.

VAZQUEZ & ASSOCIATES
1401 Brickell Avenue
Suite 500
Miami, Florida 33131
305-371-8064

THE STATE OF FLORIDA
TO EACH SHERIFF OF THE STATE: You are commanded to serve this Summons and a copy of the Complaint in this lawsuit on the above-named Defendant(s).

DATED ON JUNE JUN 29 2009, 2009.

(SEAL)

CLERK OF THE CIRCUIT & COUNTY COURTS
By: Caroline Williams
Deputy Clerk

SILVIA BLANCO, an individual,
Plaintiff,

Vs.

MIAMI BEACHFRONT INVESTMENTS, LLC.
A Florida limited liability company,
FORTUNE INTERNATIONAL
REALTY, INC. A Florida Corporation,
EDGARDO DE FORTUNA, an individual,
HUGO BIANCHI, an individual.
Defendants.

______________________________/

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND
FOR MIAMI DADE COUNTY,
FLORIDA

CASE NO.

09-49095 CA 25

6/30
2:00P
CP #257

**SUMMONS**
**PERSONAL SERVICE ON A NATURAL PERSON**

Serve: EDGARDO DE FORTUNA
2666 BRICKELL AVENUE, 3RD FLOOR
MIAMI, FLORIDA 33129

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint in this Court. A phone call will not protect you; your written response, including the above case number and named parties, must be filed if you want the Court to hear your case. If you do not file your response on time, you may lose the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff(s)/Plaintiff's Attorney" named below.

VAZQUEZ & ASSOCIATES
1401 Brickell Avenue
Suite 500
Miami, Florida 33131
305-371-8064

THE STATE OF FLORIDA
TO EACH SHERIFF OF THE STATE: You are commanded to serve this Summons and a copy of the Complaint in this lawsuit on the above-named Defendant(s).

DATED ON JUNE JUN 2 9 2009, 2009.

Caroline Williams 209646

CLERK OF THE CIRCUIT & COUNTY COURTS
By: ______________________________
Deputy Clerk

(SEAL)

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

FILED by D.C.
JUL 30 2009
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. - MIAMI

09-22260

**I. (a) PLAINTIFFS**

SILVIA BLANCO

(b) County of Residence of First Listed Plaintiff Bolivar, Venezuela
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)

Gerardo A. Vazquez, Vazquez & Associates, Suite 500, 1401 Brickell Avenue, Miami, Florida 33131 Tel: 305-371-8064

**DEFENDANTS**

MIAMI BEACHFRONT INVESTMENTS, LLC, FORTUNE INTERNATIONAL REALTY, INC., EDGARDO DEFORTUNA,

County of Residence of First Listed Defendant Miami-Dade County, FL
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

Susan E. Raffanello, Coffey Burlington, 2699 South Bayshore Drive, Penthouse, Miami, Florida 33133 Tel: 305-858-2900

CIV-KING

(d) Check County Where Action Arose: ✓ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

MAGISTRATE BANDSTRA

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
✓ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

09CV 22260 King/Bandstra

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding ✓ 2 Removed from State Court ☐ 3 Re-filed- (see VI below) ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):

a) Re-filed Case ☐ YES ✓ NO b) Related Cases ☐ YES ✓ NO

JUDGE DOCKET NUMBER

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause **(Do not cite jurisdictional statutes unless diversity)**:

15 U.S.C. Section 78j(b) - Alleged misrepresentation in connection with sale of security; 28 U.S.C. Sections 1441. 1446

LENGTH OF TRIAL via ______ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** CHECK YES only if demanded in complaint: **JURY DEMAND:** ☐ Yes ✓ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

SIGNATURE OF ATTORNEY OF RECORD [signature] DATE July 30, 2009

**FOR OFFICE USE ONLY**

AMOUNT 350— RECEIPT # 1005666 IFP ______